**EXHIBIT B**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY, *et al.*, | ) ) ) ) | Case No. 12-12171 (REG) |
| Debtors. | ) ) ) ) ) ) | (Joint Administration Requested) |

**DECLARATION OF JAMES H. BAIRD IN SUPPORT OF
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS (A) TO OBTAIN POSTPETITION
FINANCING PURSUANT TO 11 U.S.C. §§ 105(a), 362, 364(c)(1), 364(c)(2),
364(c)(3), AND 364(d); (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11
U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 363, 364 AND 507, (III)
GRANTING CERTAIN PROTECTIVE RELIEF WITH REGARD TO THE FEE
LETTERS RELATING TO THE DIP/EXIT FACILITIES, AND (IV) SCHEDULING A
FINAL HEARING ON DEBTOR-IN-POSSESSION AND EXIT FINANCING
PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

JAMES H. BAIRD, pursuant to 28 U.S.C. § 1746, declares:

1. I am a Vice President of Blackstone Advisory Partners L.P. ("**Blackstone**"), a subsidiary of The Blackstone Group, L.P., a global alternative asset manager and provider of financial advisory services listed on the New York Stock Exchange that maintains offices at 345 Park Avenue, New York, New York 10154. I submit this declaration (the "**Declaration**") in support of the Debtors' Motion for Entry of Interim And Final Orders (I) Authorizing The Debtors (A) To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), And 364(d); (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. § 361, 362, 363, 364, and 507, (III) Granting Certain Protective Relief With Regard to the

Fee Letters Relating to the DIP/Exit Facilities, and (IV) Scheduling Final Hearing on Debtor-in-Possession And Exit Financing Pursuant To Bankruptcy Rules 4001(b) And (c) (the "**Motion**").[1]

2. Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my discussions with responsible management and professionals of the Debtors and/or my review of relevant documents. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions and/or review of documents. I am authorized to submit this Declaration on behalf of the Debtors. I am not being compensated specifically for this testimony other than payments received by Blackstone as a professional proposed to be retained in these chapter 11 cases.

## MY BACKGROUND AND QUALIFICATIONS

3. I have an MBA in Finance with Honors from Columbia Business School and an AB in Economics from Bowdoin College.

4. I first joined Blackstone in 2002. I have advised numerous public and private companies in complex restructurings, including, among others, American International Group (and its subsidiaries American General Finance Corp. and International Lease Finance Corp.), Ford Motor Company, General Motors Company, The Mohegan Tribal Gaming Authority and Star Tribune Company.

5. In connection with the above-referenced restructuring engagements, I have advised distressed companies in connection with obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing, and negotiating the terms of such financing.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

6. As a finance and restructuring professional, I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in distressed and bankruptcy situations.

## BLACKSTONE'S QUALIFICATIONS

7. Blackstone is a leading global alternative asset manager and provider of financial advisory services listed on the New York Stock Exchange (ticker symbol: BX). Blackstone's restructuring and reorganization advisory operation is one of the leading advisers to companies and creditors in restructurings and bankruptcies.

8. Blackstone professionals have extensive experience working with financially troubled companies in complex financial restructurings. Since 1991, Blackstone has advised on more than 300 distressed situations, both in and out of bankruptcy proceedings, involving more than $1 trillion of total liabilities.

9. Blackstone's professionals have been retained as investment bankers and financial advisors in many troubled company situations, including, among others, American International Group (and its subsidiaries American General Finance Corp and International Lease Finance Corp), Delta Air Lines, Inc., Delphi Corporation, Enron Corporation, Flying J Inc, Global Crossing Limited, Lee Enterprises Inc., Lyondell Chemical Company, The Mohegan Tribal Gaming Authority, The Pacific Lumber Company / Scotia Pacific Company LLC, R.H. Macy & Company, Inc., and SemGroup, L.P.

10. On or about February 2, 2012, Blackstone was engaged to provide investment banking and financial advisory services to the Debtors in connection with their restructuring efforts. Blackstone, among other advisory services, has: (a) analyzed the Debtors' current liquidity and projected cash flow; (b) assisted the Debtors in evaluating their

restructuring and other strategic alternatives; (c) helped the Debtors prepare for a potential chapter 11 filing; and (d) as part of that preparation for a possible chapter 11 filing, conducted a comprehensive search to obtain debtor-in-possession and exit financing for the Debtors on the most competitive terms and conditions available to them.

## THE DEBTORS' NEED FOR POSTPETITION AND EXIT FINANCING

11.     As of April 30, 2012, the Debtors' overall principal debt obligations, including secured bank debt and secured notes (but excluding other off-balance sheet monetizations and capital lease obligations) totaled approximately $3.1 billion. All $3.1 billion of these obligations are secured by substantially all assets of the Company.[2] The global financial crisis over the past several years has negatively affected the Debtors' recent financial performance. The Debtors' business depends largely on state and local funding. Recession-driven decreases in state spending as well as significant purchase deferrals in key states and territories resulted in material reductions in the overall size of the Debtors' key K-12 market. Lack of anticipated federal stimulus support also contributed to the Debtors' substantial revenue decline.

12.     Despite the out-of-court restructuring that the Debtors undertook in March 2010, due to the continuing contraction of funds for state education spending and higher deferrals of awarded business than expected, the Debtors have continued to experience financial difficulties. On or about December 22, 2011 and December 29, 2011, the Debtors entered into amendments (collectively, the "**Amendments**") to their first lien credit facility and receivables facility, respectively, in order to loosen levels of financial requirements of the Company (specifically, EBITDA and related covenants) under those facilities.

---

[2] The Prepetition Receivables Facility is currently undrawn.

13. However, notwithstanding the Amendments, due to the current recession and the lack of sources of liquidity in the markets generally, the Company's indebtedness rendered it vulnerable to adverse economic and industry conditions, impaired its ability to obtain additional financing, required it to dedicate a substantial portion of cash flow from operations to service debt, and has otherwise limited its flexibility in planning and responding to a changing business environment. The Company's need for additional financing is urgent as it approaches the seasonal low point for liquidity and the very important selling season. In addition, the Company's Prepetition Receivables Facility will be terminated upon a bankruptcy filing.

14. Attached hereto as Schedule A is a pro forma 13-week cash flow forecast of the Debtors (the "**Thirteen Week Forecast**"), prepared by the Debtors in consultation with Blackstone. The Thirteen Week Forecast reflects the Debtors' reasonable judgment as to the cash required over the identified period to keep the Debtors' businesses operational. Blackstone and the Debtors believe the level of expenditures reflected in the Thirteen Week Forecast is prudent to preserve the value of the Debtors' estates. The cash position of the Debtors after the period identified in the Thirteen Week Forecast will depend on a number of factors, such as operational performance, asset dispositions, the pace of business restructurings, and global liquidity needs.

**THE DEBTORS' EFFORTS TO OBTAIN POSTPETITION AND EXIT FINANCING**

15. Faced with desire to bolster the capital structure, enhance its liquidity position and position the Company for financial strength, the Debtors began to explore strategic alternatives and ways to enhance liquidity at the end of 2011. As part of this process, the Debtors engaged Blackstone in early 2012. Contemporaneously with negotiating a restructuring support agreement with the Informal Creditor Group, the Debtors, through Blackstone, solicited

new financing proposals from various financial institutions, which have historically been providers of debtor-in-possession and exit financing, including their existing capital structure constituents. The Debtors' efforts to obtain debtor-in-possession and exit financing were complicated by the Debtors' high level of secured debt, the fact that substantially all of the Debtors' assets are encumbered, recent challenges facing the publishing industry broadly, difficult situations facing certain of the Company's competitors and that the current market environment is quite challenging for such financings.

16. In March and April 2012, in response to Blackstone's inquiries, certain prospective providers of debtor-in-possession and exit financing expressed some interest. Of the seven contacted parties, most were hesitant to underwrite a $500 million DIP-to-Exit financing for the Debtors, and only one ultimately reached the point of providing a fully committed proposal. Party number one failed to respond to several attempts by both Blackstone and the Debtors to open discussions. Party number two pulled out of the process following our initial meeting. Parties number three and four considered participating in only the DIP ABL Facility and conducted moderate diligence but were unwilling to lead a committed transaction. Blackstone and the Debtors spent time with the remaining three parties and gave them additional information and materials with respect to the Debtors' operations and financial condition. These prospective providers also met with relevant management of the Debtors to facilitate the providers' diligence efforts.

17. In March and April 2012, Blackstone ultimately received written indications of interest from these three prospective providers, all of whom were willing to arrange debtor-in-possession and exit financing to the Debtors and provided indicative, non-binding proposals. Subsequent to the receipt of these financing proposals, the prospective

arrangers engaged in further business due diligence sessions with the Company and Blackstone, leading to further negotiations with the Company and Blackstone in an attempt to improve the proposals.

18. Of the three non-binding proposals that were submitted to the Company and Blackstone, the proposals from parties five and six were based on the "best efforts" of the agent to assemble a syndicate of lenders to finance the loans. The "best efforts" proposals left the Company with uncertainty that the engagements would result in a funded credit facility and presented potential challenges to confirmation and even the possibility of a lack of funding post-confirmation. They further raised doubts as to the Debtors' ability to complete their efforts in a timely manner. Party number six eventually became willing to consider providing a commitment but was not particularly responsive throughout the process and, as a result, fell behind on completing the diligence and documentation processes necessary to finalize the financing process. Attempting to close a facility with this lender would have delayed the timeline for the Debtors' restructuring process, which would have been detrimental to both the Debtors and their creditors. The overall pricing of this and the other proposals was higher than the Citi proposal and their terms were more restrictive. Further, Citi's commitment to the transaction far exceeded all other contacted parties.

19. At the end of April, upon attempting to improve all of the proposals, two of the final three parties dropped out of the process. The Company decided to pursue finalization of a debtor-in-possession and exit financing proposal from Citi that provided terms that were, in Blackstone's judgment, very favorable. Citi was the only party to submit a complete set of binding financing proposal documents, including the commitment letter and associated term sheet, which evolved into the proposed DIP/Exit Facilities.

20. During the latter part of April and into early May, Blackstone continued negotiations with Citi in an effort to get the best possible debtor-in-possession and exit financing under the extremely tight time constraints facing the Company. On May 10, 2012, the Company finalized its DIP/Exit Facilities proposal and signed commitment papers with Citi that provided for a fully-committed $500 million new financing on very favorable terms.

21. Based on Blackstone's analysis of the proposals, Blackstone has advised management of the Company that Blackstone believes that Citi's DIP/Exit Facilities proposal is the most advantageous to the Debtors for a number of reasons, including that it is less expensive and provides for debtor-in-possession and exit financing on more favorable terms than other comparable offers. In addition, the fees associated with the DIP/Exit Facilities compare favorably in rate and structure to other financings that are presently available in this difficult credit market. Moreover, based upon the Company's familiarity and prior experience with Citi providing funding in tight timeframes on very favorable terms, the execution risk, certainty of closing and likelihood of flexibility and supportiveness in the future weighed in favor of Citi.

22. Based on my experience and discussions with various lenders and financing providers, I do not believe the Debtors could have obtained a postpetition financing and exit facility of the type and magnitude required in these cases on an unsecured basis or on any other basis than the terms of the DIP/Exit Facilities.

## THE COMPANY'S APPROVAL OF THE DIP/EXIT FACILITIES

23. On May 8, 2012, subsequent to Blackstone's presentation of its analysis to the management of the Company, Blackstone presented its analysis of the proposals to the Company's Board of Directors. After Blackstone's presentation, management recommended, with Blackstone's concurrence, that the Citi proposal was the best alternative available. After

discussion, the Board unanimously decided to move forward to finalize Citi's proposed DIP/Exit Facilities as expeditiously as possible.

24. Representatives of the Company and Citi have negotiated a definitive DIP/Exit Loan Agreements, which contain terms that are favorable to the Company.

25. At a meeting of the Board of Directors on May 18, 2012, Blackstone and management reviewed the final terms of the DIP/Exit Facilities and recommended that the Board approve it. After discussions, the Board unanimously approved the terms of the DIP/Exit Facilities.

## THE DIP/EXIT FACILITIES ARE FAIR AND REASONABLE

26. It is my opinion that the pricing, fees, interest rates and other terms and conditions of the DIP/Exit Facilities are fair, reasonable and advantageous to the Debtors, particularly in light of the alternative proposals, the term of the facility, the exit aspect of the facility and the state of the credit markets generally. The DIP/Exit Facilities provide the Debtors with immediate and sufficient liquidity to fund their operating, working capital and capital expenditure needs not only during the course of these chapter 11 cases but post-emergence. As discussed above, it is, in my opinion under the present circumstances, the most attractive, and only, financing alternative available to the Company at this time.

## FEE LETTERS RELATING TO THE DIP/EXIT FACILITIES

27. As consideration for the DIP Agent's agreements in connection with the DIP Facility, the Debtors have agreed to pay the fees set forth in the Fee Letters, as described in the Motion.

28. The Fee Letters contain commercially sensitive information and the full disclosure of the Fee Letters could increase the costs of financing for the Debtors.

29. Specifically, disclosing the "flex rights" within the fee arrangement described in the Fee Letters, which remains particularly relevant as the syndication process is beginning, would severely limit Citi's ability to effectively market and syndicate the DIP financing to the marketplace and could increase the cost of the DIP financing to the Debtors' estates. It is my opinion that public disclosure of the confidential and proprietary information contained in the Fee Letters would harm the Debtors and impair CGMI's ability to syndicate these facilities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 21, 2012

_____
JAMES H. BAIRD

# Schedule A

**PROJECT PRESS**
13 Week Cash Flow as of 5-20-12
($ in millions)

Draft-Confidential
($ in millions)

| | Act 5/11 | Act 5/18 | Week 1 Fcst 5/25 | Week 2 Fcst 6/1 | Week 3 Fcst 6/8 | Week 4 Fcst 6/15 | Week 5 Fcst 6/22 | Week 6 Fcst 6/29 | Week 7 Fcst 7/6 | Week 8 Fcst 7/13 | Week 9 Fcst 7/20 | Week 10 Fcst 7/27 | Week 11 Fcst 8/3 | Week 12 Fcst 8/10 | Week 13 Fcst 8/17 | Fcst Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPERATING CASH FLOW:** | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | |
| Accounts Receivable | $11.3 | $15.0 | $10.1 | $9.6 | $10.7 | $12.2 | $18.5 | $20.1 | $39.3 | $29.5 | $44.5 | $30.9 | $25.4 | $33.3 | $44.2 | $328.3 |
| Other Deposits | 0.3 | 0.3 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | $11.6 | $15.3 | $10.1 | $9.6 | $10.7 | $12.2 | $18.5 | $20.1 | $39.3 | $29.5 | $44.5 | $30.9 | $25.4 | $33.3 | $44.2 | $328.3 |
| **Disbursements** | | | | | | | | | | | | | | | | |
| General Disbursements | $13.1 | $26.3 | $27.9 | $19.5 | $20.6 | $32.8 | $19.6 | $22.7 | $17.0 | $21.5 | $35.4 | $22.4 | $38.3 | $45.9 | $62.5 | $386.1 |
| Payroll | 0.8 | 11.5 | 0.5 | 9.5 | 0.5 | 10.0 | 0.5 | 9.5 | 0.6 | 9.5 | 0.6 | 11.9 | 0.4 | 16.2 | 0.6 | 70.3 |
| **Total Disbursements** | $13.9 | $37.8 | $28.4 | $29.0 | $21.1 | $42.9 | $20.1 | $32.2 | $17.6 | $31.0 | $36.0 | $34.3 | $38.7 | $62.1 | $63.1 | $456.4 |
| Other | (1.5) | 2.2 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operational Cash Flow** | $(3.8) | $(20.3) | $(18.3) | $(19.4) | $(10.4) | $(30.6) | $(1.6) | $(12.1) | $21.7 | $(1.6) | $8.5 | $(3.3) | $(13.3) | $(28.8) | $(18.9) | $(128.2) |
| **TRANSACTION RELATED CASH FLOW:** | | | | | | | | | | | | | | | | |
| Restructuring Fees | (1.6) | (6.7) | (16.9) | - | - | - | - | (17.5) | - | - | - | - | - | - | - | (34.4) |
| Adequate Protection / Distributions | - | - | (69.7) | - | - | - | - | (30.3) | - | - | - | - | - | - | - | (100.0) |
| **DIP Facility** | | | | | | | | | | | | | | | | |
| ABL Draw | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term Loan | - | - | 150.0 | - | - | - | - | 100.0 | - | - | - | - | - | - | - | 250.0 |
| Interest Payments | - | - | - | - | - | - | - | (1.2) | - | - | - | (1.7) | - | - | - | (2.9) |
| **Net Cash Flow** | $(5.5) | $(27.0) | $45.1 | $(19.4) | $(10.4) | $(30.6) | $(1.6) | $38.8 | $21.7 | $(1.6) | $8.5 | $(5.1) | $(13.3) | $(28.8) | $(18.9) | $(15.5) |
| **Liquidity Summary** | | | | | | | | | | | | | | | | |
| Operating Cash | $114.0 | $87.0 | $132.1 | $112.7 | $102.3 | $71.7 | $70.1 | $108.9 | $130.6 | $129.0 | $137.5 | $132.4 | $119.2 | $90.4 | $71.5 | $71.5 |
| Available Borrowings | 32.2 | 32.2 | 145.2 | 145.2 | 145.2 | 145.2 | 145.2 | 145.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 | 165.2 |
| **Total Liquidity** | $146.2 | $119.2 | $277.2 | $257.8 | $247.5 | $216.9 | $215.3 | $254.1 | $295.8 | $294.2 | $302.7 | $297.6 | $284.4 | $255.5 | $236.7 | $236.7 |
| **DIP Facility Summary** | | | | | | | | | | | | | | | | |
| Borrowing Base | $52.2 | $52.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 |
| Availability Limit | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 20.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Available** | $32.2 | $32.2 | $155.2 | $155.2 | $155.2 | $155.2 | $155.2 | $155.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 | $175.2 |
| Cash Draws | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| LC Issuance | - | - | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 | 10.0 |
| Total outstanding | $- | $- | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 | $10.0 |
| **Available Borrowings** | $32.2 | $32.2 | $145.2 | $145.2 | $145.2 | $145.2 | $145.2 | $145.2 | $165.2 | $165.2 | $165.2 | $165.2 | $165.2 | $165.2 | $165.2 | $165.2 |

Note: Operating cash represents that of debtor-entities only.